FILED

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL W. MATONTE, a minor,
by and through his parent, Philip J.
Matonte; and Philip J. Matonte, for
himself,

        Plaintiffs,

vs.

PINELLAS COUNTY SCHOOL BOARD,

        Respondent,

_____ /

CASE NO. 99-907-CIV-T-26F

## COMPLAINT FOR RELIEF, COSTS, DAMAGES, AND DEMAND FOR JURY TRIAL

      The plaintiffs, Michael W. Matonte, a minor, by and through his parent, Philip J. Matonte, and Philip J. Matonte for himself, hear by make complaint to sue the defendants, the PINELLAS COUNTY SCHOOL BOARD, and say:

      1.     This is an action to redress grievances for violations of the Individuals with Disabilities Education Act, 20 U.S.C. Secs. 1400, et seq., 1415 (I) (2) (A) ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. sec. 794 (the "Rehabilitation Act"), the Civil Rights Act, 42 U.S.C. secs. 1981, et seq., federal regulations, including 34 C.F.R. parts 104 and 300 and pendent causes of action.

### JURISDICTION

      2.     This Court has subject matter jurisdiction pursuant to 20 U.S.C. secs. 1415 and 28 U.S.C. and secs. 1331, 1337 and 1343, without regard to the amount in controversy.  Additionally, the Court has pendent jurisdiction of the state causes of action, each of which derives from a common nucleus of operative facts such that they would ordinarily be expected to be tried in the same proceeding as the federal claims.

      3.     The plaintiffs have performed all conditions precedent to the institution and maintenance of this action, including administrative remedies made available to them under the laws of the State of Florida.

### PARTIES

      4.     Michael W. Matonte ("Michael") is a child who resides in Pinellas County, Florida. Michael attended Kennedy Middle School in Pinellas County, Florida.  His date of birth is July 5, 1985.  Michael has pervasive development disorder with autistic features and attention deficit



65010
$150.00

1

hyperactivity disorder and has developmental and physical disabilities related to those disorders. Michael is a child with disabilities as defined in 20 U.S.C. § 1401(1)(A) and is an individual with handicaps as defined in 29 U.S.C. § 706(8).

5.     Philip J. Matonte is Michael's parent.  They reside in Pinellas County, Florida. Collectively, Michael and Philip are referred to herein as the "Matontes."

6.     The defendant School Board for Pinellas County, Florida (the "School Board") receives financial assistance from the United States federal government which assistance is made available through the incentive grants program that is the IDEA.  Consequently, the School Board is subject to the provisions of the IDEA and is required to provide a free appropriate public education to all children with disabilities, including Michael Matonte.  Further, as a state agency that has accepted federal financial assistance in respect to programs at Kennedy Middle School, the School Board is prohibited under the Rehabilitation Act from discriminating against Michael Matonte and other persons with disabilities.

8.     Kennedy Middle School is a public school operated by the School Board.

## GENERAL ALLEGATIONS

10.     The School Board violated the substantive and procedural rights of the Matontes, protected under the IDEA, and engaged in discrimination and retaliation against the Matontes in violation of the Rehabilitation Act.  The School Board deprived the Matontes of rights secured to them by federal law in violation of 42 U.S.C. § 1983.  Many of the facts upon which the Matontes rely to support this allegation are set forth in the case files of Case No. 98-3804E, Final Order rendered on March 17, 1999, by the Honorable  William F. Quattlebaum, a Hearing Officer with the State of Florida Division of Administrative Hearings (the "Final Order").  A true and correct copy of the Final Order and Petitioner's Recommended Final Order is attached hereto, identified as "Exhibit A," and "Exhibit "B" and incorporated herein as if set forth fully.  The Matontes seek the relief sought in their recommended final order and compensation for the significant damages they have suffered.

11.     On or about August 26, 1998, the Matontes requested a due process hearing pursuant to 20 U.S.C. § 1415 to redress their grievances about the School Board's failure to provide Michael Matonte an appropriate education and failure to honor the Matontes' procedural rights to participate in decisions respecting Michael's education.  That hearing was held on December 7-8 and 17, 1998. It resulted in the Final Order, which did not provide relief to the Matontes who were subjected to numerous violations of law by the School Board, including, but not limited to:

        a)     implementing an unlawful, unwritten policy that had the effect of ignoring the individual educational needs of students with disabilities, including Michael;

        b)     extensive violations of Michael's parents' rights to participate in his educational program;

        c)     extensive violations of Michael's procedural rights in the formulation and implementation of his individualized educational program ("IEP");

        d)     acting in bad faith against the Matontes;

        e)     failing to provide Michael a free appropriate public education;

        f)     implementing an educational program based on subjective low expectations for, despite objective evaluations that demonstrated his greater capabilities;

g)   discriminating against Michael based on his handicap; and

h)   engaging in retaliation against the Matontes.

12.   This action is to show that the Matontes' substantive and procedural rights were violated by the School Board. Also, show that the School Board discriminated and retaliated against the Matontes. Also show that an unwritten policy being implemented by the School Board violated the IDEA. The Matontes' seek reimbursement for the expenses they incurred providing education to Michael that should have been provided by the School Board and obtaining evaluations to determine his educational regression and need for compensatory therapy. Also fees and costs incurred in connection with the administrative proceeding and award damages beyond reimbursing the Matontes their out-of-pocket expenses.

13.   Following the Final Order, the Matontes timely commenced this action to appeal the inadequacy of the Final Order to provide relief and damages award and to ensure their entitlement to damages, fees and costs.

14.   The Matontes wish to present additional evidence to provide the finder of fact adequate information on which to determine the appropriate relief and amount of damages that are appropriate in consideration of the School Board's actions.

15.   In addition to, or elaboration of, the matters established in the Administrative Hearing, the following matters are set forth. The School Board violated the Matontes' rights by engaging in various acts including, but not limited to:

a)   failing to properly evaluate Michael for purposes of determining the need for compensatory services following the School Board's failure to accommodations that had been committed on the IEP to which the Matontes' consented;

b)   implementing an unwritten policy or practice of precluding from students' IEPs the need for services, irrespective of the child's individual need for such services;

c)   permitting Michael to regress mentally and educationally without making any attempt to determine the reason or to otherwise intervene;

d)   employing inadequate, discriminatory procedures for identifying students with disabilities;

e)   untimely formulating an IEP for Michael upon his initial presentation to the School Board's education programs;

f)   using language-based, non-modified testing to determine Intelligence Quotient ("IQ") and using such tests to determine eligibility of students for exceptional educational services;

g)   failing to provide to Michael the least restrictive environment appropriate to him;

h)   failing to provide Michael adequate inclusion and main streaming opportunities to permit him to become an independent, contributing member of society;

I)   determining placement of students and the content of IEPs in efforts to benefit from funding that is based on the placement of the student, resulting in discrimination and failure to provide a free appropriate public education;

j)   employing inadequately qualified therapists to provide educational services to Michael;

k)   permitting low, subjective expectations for Michael's educational

3

performance to determine educational opportunity and related services to which Michael would be given access;

l)        failing to appropriately consider the parents' input in the IEP and educational process;

m)        failing to appropriately consider the evaluations and information on his disability that were obtained at the Matontes' expense while formulating and revising Michael's IEP;

n)        failing to recognize that Michael's need for an aide was a substantive aspect of his special education and was not solely a "related service";

o)        failing to provide adequate notice to the Matontes of their procedural rights;

q)        failing to give notice or adequate notice to the Matontes of the School Board's intentions to revise Michael's IEP accommodations;

r)        misleading the Matontes as to the purpose of meetings convened by the School Board and of documents the School Board generated at those meetings;

s)        revising Michael's IEP accommodations without reviewing the goals and objectives to determine whether such revision was appropriate;

t)        refusing to acknowledge Michael's educational regression;

u)        failing to obtain timely evaluations of Michael;

v)        discriminating against children with physical impairments, including Michael, in providing needed accommodations and other related services;

w)        failing to provide to the Matontes Michael's student records, despite their requests for them;

x)        failing to implement a properly formulated IEP;

y)        implementing a substitute IEP for Michael without the Matontes' knowledge or consent;

z)        revising Michael's IEP without any criteria justifying the revision;

aa)        giving immediate effect to a revised IEP to which the parent objected, which IEP revised a current, valid IEP, and failing to give the current IEP effect pursuant to the "stay put" provision of the IDEA after being placed on notice of the Matonte's dissatisfaction with and intent to challenge the revised IEP;

bb)        providing children with disabilities, including Michael, different school hours than those provided to children without disabilities;

cc)        refusing to provide Michael a bus aide;

dd)        failing to formulate an IEP that sufficiently specified the educational program necessary to address Michael's individual needs;

ee)        determining Michael's placement prior to developing his IEP;

ff)        utilizing a discriminatory form and method for determining the least restrictive environment for students with disabilities, including Michael;

gg)        failing to provide cafeteria rights to Michael based on his disability;

hh)        placing on Michael's IEP a range of services, including a lower end amount that is less than the amount deemed appropriate for Michael, rather than specifying the precise commitment of services that would be provided to him;

ii)        failing to inform the Matontes and other parents of free or low cost legal services upon the parents' statement of intention to seek an administrative hearing.

4

16.    The actions set forth in paragraph 15, above, or some of them, were undertaken in bad faith.

17.    The School Board's actions have been detrimental and destructive to Michael's well-being, both temporarily and permanently.   During a critical period in his cognitive development, Michael was deprived of educational opportunity.   That deprivation was severely detrimental to him and caused regression in his social abilities, as well as a diminishment in his ability to absorb and participate in the educational process.   Further, the School Board's actions have temporarily and permanently damaged Michael's self-esteem, identity, motivation, and development of social relationships, and have and will cause him sadness, despair, alienation, dependency, isolation, distress, stigma, deep frustration, and loss of interest in school achievement.

18.    As a proximate result of the School Board's nonfeasance and malfeasance, Michael and his parent have suffered great mental, psychological, and emotional pain and suffering, mental, psychological, and emotional anguish, shame, mortification, indignity, disgrace, embarrassment, humiliation, stigma, distress, demoralization, anger, discomfort, inconvenience, worry, anxiety, nervousness, depression, feelings of sorrow, torment and powerlessness, feelings of exclusion, loss of employment, permanent loss of earning potential and other injuries to their feelings and sensibilities, and they will continue to suffer the foregoing permanently.

19.    The Matontes need an attorney to represent them with respect to the matters raised herein but do not have the ability to pay a reasonable fee for the services rendered in connection with this and all related proceedings.

COUNT I - ATTORNEY FEES

20.    This is an action to collect from the School Board attorney fees when they are obtained and the costs related to the administrative proceeding that produced the Final Order. Further, this action seeks to collect attorney fees expended by the Matontes in all administrative and judicial proceedings relating to this matter.

WHEREFORE, the Matontes request judgment in their favor and against the School Board for attorney's fees, interest, costs, and such other and further relief as the Court deems proper and just under the circumstances.

COUNT II - DAMAGES UNDER THE REHABILITATION ACT

21.    This is an action to recover damages for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a, and the regulations promulgated pursuant thereto.

22.    The School Board engaged in intentional discrimination against Michael Matonte based on his handicap in violation of law.

23.    The School Board engaged in retaliatory conduct toward the Matontes for asserting their rights under federal law, which actions violated the Rehabilitation Act.

24.    The School Board acted intentionally and/or in bad faith.

WHEREFORE, the Matontes request judgment in their favor against the School Board for damages, punitive damages, costs, attorney's fees, interest, and such other and further relief as this Court deems proper and just under the circumstances.

5

COUNT III - 42 U.S.C. § 1983

25.     This is an action against the School Board arising under 42 U.S.C. § 1983 for damages and declaratory relief to enforce rights guaranteed under federal law.

26.     The School Board acted or failed to act under color of state law.

27.     The actions undertaken by the School Board that violated the provisions of 42 U.S.C. § 1983 are not protected by any privilege or immunity of law.

WHEREFORE, the Matontes request judgment in their favor against the School Board for damages, attorneys fees, costs and all further and other relief as this Court deems just and proper under the circumstances.

### JURY DEMAND

The Matontes demand trial by jury of all issues that a jury may properly decide and for all of the requested relief that a jury may properly award.

DATED this 15th day of April, 1999.

Respectfully submitted,


PHILIP J. MATONTE
Pro Se
320 Island Way   #506
Clearwater,  Florida  33767
Telephone (813) 220-4707
E-mail abpjm@cftnet.com

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

P. M., on behalf of M. M.,            )
a minor,                              )
                                      )
    Petitioner,                       )
                                      )
vs.                                   )  Case No. 98-3804E
                                      )
PINELLAS COUNTY SCHOOL BOARD,         )
                                      )
    Respondent.                       )
_____)

## FINAL ORDER

On December 7-8 and 17, 1998, a formal administrative hearing in this case was held before William F. Quattlebaum, Administrative Law Judge, Division of Administrative Hearings. On December 7-8, the hearing was conducted in Clearwater, Florida.  On December 17, the hearing was conducted telephonicaly and concluded in Tampa, Florida.

### APPEARANCES

For Petitioner:  P. M., pro se
               Address of Record

For Respondent:  Robin Rosenberg, Esquire
               Holland & Knight, LLP
               Post Office Box 1288
               Tampa, Florida  33601-1288

### STATEMENT OF THE ISSUE

The issues in the case are:  whether M. M. was properly identified and served in the appropriate school programs; whether the Respondent provided a free and appropriate public education to M. M.; whether the Respondent failed to safeguard the due process rights of the Petitioner; and whether the Respondent's

Exhibit "A"

1998.  The matter was scheduled for hearing, and was continued upon the request of the Respondent to permit time to obtain legal counsel.

At the hearing, the Petitioner offered the testimony of nine witnesses, testified on his own behalf, and had Exhibits numbered 1-4 admitted into evidence.  The Respondent presented the testimony of four witnesses and had Exhibits numbered 1-3 admitted into evidence.  The Prehearing Stipulation filed by the parties was admitted as an Administrative Law Judge's Exhibit.

A transcript of the hearing was filed on January 11, 1999. Pursuant to the agreement reached between the parties at the close of the hearing, the Respondent filed a Proposed Order on January 25, 1999, and the Petitioner filed a Proposed Order on February 15, 1999.

FINDINGS OF FACT

1.  M. M. is a male child, 13 years of age at the time of the hearing, and residing in Pinellas County, Florida.

2.  M. M. is an exceptional education student presently enrolled in the Hospital/Homebound program of the Pinellas County School Board.

3.  In 1993, the Hillsborough County School Board determined that M. M. was eligible for placement in an Emotionally Handicapped program, but his parents refused services under that designation.

4.  As a student in the Hillsborough County School System, M. M. was eventually identified as an "exceptional student" and

3

11.   Representatives from the Florida Diagnostic Learning and Resource System presented a program to the Kennedy MEGGS students which was intended to teach other student's about M. M.'s disability.

12.   M. M.'s experience in the MEGGS class was unsuccessful. His difficulties were exacerbated by his entry into the course at the mid-year point of the school term.  He was apparently unprepared for the difficult course.  His behavior was disruptive, and his emotional outbursts related to his lack of course success were uncontrollable.  He was subsequently transferred to an honors algebra class.

13.   The Petitioner asserts that the child's MEGGS class failure is the result of the school's failure to provide appropriate course modifications to accommodate the child's disability.  There is no credible evidence in support of the assertion.

14.   In spring of 1997, school personnel began to suggest that M. M.'s behavioral and emotional problems would be better addressed through an "Emotionally Handicapped" (EH) classification, and that the child did not meet the SLD criteria. The school reevaluated the child though the summer and into the fall of 1997.

15.   On December 17, 1997, school personnel met in a staffing meeting, and determined that the child did not meet the SLD criteria.  They further determined that he appeared to meet the EH criteria, and decided to obtain the opinion of a pediatric neurologist, Dr. Fine.

23.  On August 26, 1998, P. M. requested a due process hearing to challenge the eligibility determination made at the June 4, 1998, meeting.  At the time of the hearing, the child continued to receive personal instruction in the hospital/homebound program.

24.  The child's behavior is acknowledged to resemble those exhibited by high-functioning autistic children and by children with "Asperger's Syndrome," a relatively rare type of high-functioning autism.

25.  The child has not been specifically diagnosed with Asperger's Syndrome or with autism.  The school board asserts that the child does not meet the criteria for autism services under the Respondent's Special Programs and Procedures for Exceptional Students.  No school has proposed classification of the child under autistic program criteria.  The difficulty in actually determining the diagnosis appears to relate to the child's age at the time the disorder began to manifest, with autism being manifested at an age significantly earlier than did M. M.'s disorder.

26.  Although various professionals have not diagnosed M. M. as having Asperger's Syndrome or autism, there is little doubt that M. M. exhibits Asperger's or autistic-like symptoms.

27.  Children with Asperger's Syndrome or high-functioning autism often misinterpret social cues and are generally poor at "reading faces."  They have difficulty understanding vocal inflection, and are often unable to understand the intent of

advanced classes. According to the child's statements to school
personnel, the intense focus on grades reflects the opinion of
his father.

33. P. M. asserts that the evaluation methods used by
school board personnel do not adequately address the unusual
circumstances of a child exhibiting characteristics of Asperger's
syndrome. There is no evidence to support the assertion.

34. During his attendance at Kennedy Middle School, the IEP
team met regularly to review M. M.'s progress and to propose
substantive program accommodations in an unsuccessful effort to
assist the child to achieve some measure of success.

35. The modifications included reductions and alterations
in M. M's course assignments. M. M. was also provided with
alternative work locations and additional time to complete
schoolwork.

36. Apparently proficient at using a computer, M. M. was
allowed to complete his work using the computer, while other
students hand-wrote their assignments.

37. The evidence establishes that despite the
accommodations, M. M. did little of his class work.

38. In addition to the lack of classroom work, M. M. did
almost none of his homework. Teachers reported that the child
did very little of the work, perhaps as little as one percent of
the assignments.

39. P. M. testified that, as far as he was aware, M. M. did
all of the homework and was uncertain as to why it was not
returned to the school. P. M. suggested that the failure to

all the homework of which the father was aware.   The alteration of the homework delivery system was designed to assure that homework assignments were actually delivered to the child's home.

45.   In any event, even after the homework was directly transmitted to the father, the work remained uncompleted.

46.   The father continued to assert that the child was doing the homework and taking the completed work from home, but that the work was inexplicably not being turned in at school.   School officials continued to discuss the problem with the father but were unable to reach an agreement.

47.   P. M. testified that he offered to mail the homework back to the school, and that the school declined his suggestion.

48.   The evidence establishes that the mailing schedule suggested by P. M. would have resulted in the return of the homework approximately a week and a half after the assignments were delivered to P. M., and after the assignments had already been reviewed in the classroom.

49.   Teachers believed M. M. needed the work in class during the review.   Teachers were also concerned that if the work remained uncompleted, there would be no way to monitor whether the child was actually doing the work.

50.   The school properly declined the mail-return schedule proposed by P. M.   As an alternative, the school suggested that P. M. fax the material back to the school on a more timely basis. P. M. refused to do so.

51.   P. M. also sought to have the amount of homework being assigned to the child reduced by half, and to have the child be

as an accommodation for his disability.   There is no evidence
that the school's refusal to provide actual examinations in
advance resulted in denial of a free and appropriate public
education to the child.

58.   At one point, P. M. sought to have the school raise the
grades provided to the child.   Because M. M. sought academic
achievement as a means of providing increased self-esteem, P. M.
asserted that increased grades would result in increased self-
esteem and less stress on the child.   There is no evidence that
arbitrarily raising the child's grades would improve the child's
self-esteem or increase his academic success.   The school
properly declined to arbitrarily raise the child's grades.

59.   P. M. sought to have a "peer buddy" assigned to M. M.
A "peer buddy" program would provide a child of M. M.'s age to
assist M. M. throughout the school day.

60.   Although the Pinellas County Schools have no formal
peer buddy program, a child in M. M.'s grade agreed to act as his
"buddy."   M. M.'s buddy was eventually unable to continue to
serve in light of M. M.'s abusive behavior towards him.   No other
students are apparently willing to serve as M. M.'s "buddy."

61.   P. M. suggested that the school compensate a "buddy"
either monetarily or with class credit.   There is no evidence
that another student in M. M.'s class would be capable of
addressing M. M's behavioral issues.   The evidence establishes
that a normal 13-year-old would be unable to deal with the
behavioral and personal challenges presented by M. M.

66.  School personnel made themselves available to M. M. on an "as needed" basis, and uniformly attempted to treat M. M. in a kindly and sometimes affectionate manner.

67.  The school guidance counselor was always available to M. M.  M. M. was permitted to leave class and go to the counselor's office at his discretion.  He was encouraged to do so when he was beginning to lose control over his behavior.  He spent extensive time with his counselor.

68.  M. M. also spent a substantial amount of time with the school principal.  The principal, educated and well experienced with emotionally disturbed and handicapped children, allowed M. M. to visit him as often as the child needed.  The principal also scheduled specific time on a weekly basis to talk to M. M., and attempted to include another child at one point to assist both children in developing social interaction skills, with a very small measure of success.

69.  On numerous occasions, M. M. received disciplinary referrals for his inappropriate behavior.  Generally, upon receiving referrals, M. M. was directed to the assistant principal's office to discuss his behavior.  The assistant principal was well aware of M. M.'s disability and she often discussed his behavior with him.  When it was necessary to provide further disciplinary action, she attempted to consider his situation when determining the appropriate response to the behavior.  There is no evidence that the child was removed from class or disciplined inappropriately.

81.  In discussions with the principal, the child explained that grades were important at home, and that the failure to attain good grades would have a negative impact.  The child told other school personnel that the failure to obtain good grades would result in his having to live like a "sub-human mongoloid."

82.  M. M.'s obsession with grades led to incidents of inappropriate behavior.  His behavior was especially poor when advised of grades on tests.  He would demand grade adjustments and threatened to have teachers who would not "accommodate him" dismissed from employment.  He would demand to retake the tests.  He would become verbally disruptive and would tear up tests, sometimes eating the test paper.

83.  One teacher, unable to deal with his repeated outbursts, eventually began sending him to the guidance counselor's office before distributing test papers.  The child remained in the counselor's office where the counselor advised him of his grade, while the classroom teacher distributed the test scores to the rest of her students.  Upon hearing of his poor grades, the child would become very upset, crying and wailing for an extended period.

84.  On occasion, when M. M. was unhappy with his treatment by teachers or school mates, he would begin to write down everything that was said and done, and would advise the offending party that he would have his father take legal action against them.

85.  M. M. also threatened to sue teaches if he did not get his way, particularly in relation to his grades.  There is no

17

92.  There is no credible evidence that M. M. was ever "beaten" by any students.  There is no credible evidence that M. M. ever told any teachers or other school personnel that any students beat him.  There is no evidence that M. M. suffered any serious injury at the hands of another student while attending activities or classes at Kennedy Middle School.

93.  The Petitioner asserts that the Respondent has failed to properly identify and to serve M. M. in the appropriate school programs, and that the child has been denied a free and appropriate public education.

94.  The evidence establishes that M. M. has been properly identified and served in the appropriate school programs.  The Respondent has provided a free and appropriate public education to M. M.  There is no credible evidence that the failure of the child to achieve academic and personal success at Kennedy Middle School has resulted from the efforts of schoolteachers and other personnel.

95.  The Petitioner asserts that the Respondent failed to safeguard the due process rights of the Petitioner.  There is no credible evidence in support of this assertion.

96.  The Petitioner asserts that the Respondent's eligibility criteria for "Exceptional Student Education" programs operates to prevent M. M. from participating in programs for which he would otherwise be eligible.  There is no credible evidence in support of this assertion.

97.  The Petitioner suggests that the child "should not be excluded from any program offered as a result of inappropriate

102. Some EH classrooms apparently include children with conduct disorders. The Petitioner properly objects to placement of the child into program setting which also include children exhibiting conduct disorders. The testimony at the hearing of all credible witnesses acknowledged that placement of M. M. in a "conduct disorder" classroom would be detrimental to M. M.

103. The Respondent has not proposed placement of M. M. into any setting that includes children exhibiting conduct disorders.

104. Although the current placement in the homebound program has apparently resulted in increased academic success, the child continues to display elevated anxiety and depression. He has limited interaction with children of his age group. No social skills training is currently being provided.

105. The evidence fails to establish that the child meets the existing criteria for classification under the hospital/homebound program.

<u>CONCLUSIONS OF LAW</u>

106. The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding. Section 230.23(4)(m), Florida Statutes, and 20 U.S.C. 1400, <u>et</u> <u>seq</u>. (IDEA).

107. The Individuals with Disabilities Education Act, 20 U.S.C. 1400, <u>et</u> <u>seq</u>. (IDEA) provides the right of all disabled children to a free appropriate public education.

108. Local school districts must meet the requirements set forth by the state educational agency charged with adopting

21

(B) meet the standards of the State
educational agency,

(C) include an appropriate preschool,
elementary, or secondary school education in
the State involved, and

(D) are provided in conformity with the
individualized education program required
under section 1414(a)(5) of this title.

113.   The IDEA defines "special education" at 20 U.S.C.

1401(a)16, as follows:

Specially designed instruction, at no cost to
[parents or guardians to meet the unique
needs of a child with a disability including

(A) instruction conducted in the classroom,
in the home, and hospitals and institutions,
and in other settings;, and

(b) instruction in physical education.

114.   Rule 6A-6.0301(1), Florida Administrative Code,

provides as follows:

An exceptional student shall mean any child
or youth enrolled in or eligible for
enrollment in the public schools of a
District who require special instruction or
related services to take full advantage or
respond to educational programs or
opportunities because of a physical, mental,
emotional, social or learning exceptionality
as defined in Rules 6A-6.03011 through 6A-
6.03025, FAC.

115.   The evidence establishes that M. M. is entitled to the

protection of, and to the educational opportunities provided

through, the IDEA.

116.   Rule 6A-6.03016, Florida Administrative Code, governs

programs for emotionally handicapped children.   Rule 6A-

6.03016(1) defines an emotional handicap as follows:

An emotional handicap is defined as a
condition resulting in persistent and

23

119.   In order to satisfy the IDEA requirement of a free appropriate public education, the district must provide personalized instruction with sufficient support services to permit the handicapped child to benefit educationally from that instruction.   The district is not required to maximize the child's educational benefit or guarantee a specific level of success.   The child is entitled to an individual plan of instruction that contains goals and objective reasonable calculated to provide educational benefit.   The issue at an administrative hearing is to determine whether the district has complied with statutory procedures, and then determine whether individualized program developed through such procedures is reasonably calculated to enable child to receive educational benefits.   Board of Education v. Rowley, 458 U. S. 176 (U.S. 1982), JSK v. Hendry County School Board, 941 F.2d 1563 (11th Cir. 1991).

120.   In this case, the evidence establishes that the Respondent complied with statutory procedures.   The evidence establishes that the child's parent received all substantive information related to scheduled meetings and proposed placements.

121.   The evidence further establishes that the IEP developed on behalf of the child is reasonably calculated to enable the child to receive educational benefits.   The IEP sets forth the situation regarding the child's behavior, and sets forth specific goals and measurable objectives designed to address the child's behavioral deficiencies.

DONE AND ORDERED this ___ day of March, 1999, in
Tallahassee, Leon County, Florida.

WILLIAM F. QUATTLEBAUM
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida 32399-3060
(850) 488-9675   SUNCOM 278-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this ___ day of March, 1999.

COPIES FURNISHED:

P. M.
Address of Record

Robin L. Rosenberg, Esquire
Holland & Knight
Post Office Box 1288
Tampa, Florida  33601-1288

Dr. J. Howard Hinesley, Superintendent
Pinellas County School Board
301 4th Street, Southwest
Largo, Florida  33770-2942

Iris Anderson, Program Specialist
Procedural Safeguards
Department of Education
614 Florida Education Center
325 West Gaines Street
Tallahassee, Florida  32399-0400

Michael H. Olenick, General Counsel
Department of Education
The Capitol, Suite 1701
Tallahassee, Florida  32399-0400

## NOTICE OF RIGHT TO JUDICIAL REVIEW

1.  This decision and its findings are final, unless an
adversely affected party:

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

P.M. on behalf of M.M.,
a minor,

       Petitioner,

v.                                        Case No. 98-3804E

PINELLAS COUNTY SCHOOL BOARD,

       Respondent.

_____/

## PETITIONER'S PROPOSED RECOMMENDED ORDER

Pursuant to notice, a formal hearing was held in this case on December 7th and 8th, in

Pinellas County Florida before William F. Quattlebaum, Administrative Law Judge of the Division

of Administrative Hearings. Additional testimony was taken on December 17th, wherein all parties

were present at the office of Dr. Jose Foradada in Hillsborough County and the Administrative Law

Judge attended by telephone.

## APPEARANCES

For Petitioner:          Philip Matonte, pro se
                         320 Island Way, #506
                         Clearwater, FL 33767

For Respondent:        Robin Rosenberg, Esquire
                         Holland & Knight LLP
                         400 N. Ashley
                         P.O. Box 1288
                         Tampa, FL 33601-1288

## STATEMENT OF THE ISSUE

Whether M.M. has been denied his procedural safeguards and due process by being placed

in Emotionally Handicapped services and through his treatment from PCSB. Whether M.M. should

Exhibit "B"

be provided services for Emotionally Handicapped students.  Also whether PCSB eligibility criteria

for "Exceptional Student Education" programs prevents M.M from participating in programs that

he would otherwise be entitled to if it were not for his handicap in violation of 504 mandates.  Also,

whether M.M.'s current Individual Education Plan ("IEP") provides him with a Free Appropriate

Public Education ("FAPE").  (Pre-Hearing Stip.)1

<u>PRELIMINARY STATEMENT</u>

By letter dated, August 26, 1998, P.M. requested a due process hearing regarding M.M.'s

eligibility for "Exceptional Student Education."  P.M.'s request was forwarded to the Division of

Administrative Hearings on August 27, 1998.  On August 28, 1998, this matter was set for hearing

on September 17, 1998.  The hearing was continued at the request of PCSB until December 7th due

to the unavailability of counsel and key witnesses.

At the hearing Respondent presented the testimony of the following PCSB personnel: Pamela

Harshbarger, the Compliance Supervisor for the Exceptional Student Education Program; Dr.

Camille Fine, pediatric neuropsychologist; Dr. David Wheeler, school psychologist; and Michael

Bessette, the principal of Kennedy Middle School.  Petitioner presented the testimony of Pamela

Morse, hospital homebound teacher, and the following staff of Kennedy Middle School:  Vicki

Evans, Specific Learning Disabilities ("SLD") resource teacher; Betty M. Helphrey, math teacher;

Sherry Johnson, social studies and literature teacher; Linda Carlson, guidance counselor; Rocco

Cappo, science teacher; Christina Higgins-Miller, math teacher; Freddie Robinson, assistant

_____

1 References to the record are made as follows: facts stipulated to in the Pre-hearing Stipulation
are referenced as (Stip. ¶__); documents in Respondent's evidence notebook are referred to as (Ex.
1 p.__) and Transcript of Proceedings will be by witness name and page number, eg. (Evans p. _).

principal; and Jim Zweifel, after-school program liaison.   P.M. also testified.   On December 17th, Petitioner presented the testimony of pediatric neurologist Dr. Jose Foradada.

Petitioner offered 4 exhibits, all of which were admitted into evidence.   Respondent offered a composite exhibit of documentary evidence along with 2 other exhibits, all of which were admitted into evidence.

The hearing was recorded and transcribed, with a verbatim transcription provided to Petitioner by PCSB.   Both parties submitted proposed orders.

## FINDINGS OF FACT

### Background

1.      M.M. is a thirteen year old male residing in Pinellas County, Florida.   M.M. is an exceptional education student presently enrolled in the Hospital/Homebound program of the Pinellas County School Board ("PCSB"). (Stip. ¶1)

2.      In 1993, the Hillsborough County School Board determined that M.M. was eligible for emotionally handicapped placement, but his parents refused services under that designation based on Dr. Foradada's and other expert's recommendation. (Stip. ¶2)

3.      Although various professionals have determined that M.M. displays symptoms of high functioning autism or Asperger's Syndrome, no specific diagnoses of either disorder has been made by M.M.'s doctors. M.M.'s doctor has diagnosed him with Pervasive Development Disorder and Asperger's Syndrome is defined in the medical literature and by various professionals (Gillberg 1988, Blinded by Their Strengths, exhibit 3 page 8) as "a pervasive developmental disorder which falls typically within the high functioning area of the Autism spectrum. (Stip. ¶2)

3

4.      M.M. was first enrolled in Pinellas County schools in January of 1996, when he began as a sixth grade student in Kennedy Middle School ("Kennedy"). M.M. attended Kennedy for the entire 1997-1998 school year. (Stip. ¶4)

5.      Prior to entering Pinellas County schools, M.M. was enrolled in Hillsborough County schools as an exceptional student with an assignment for Gifted and Specific Learning Disabilities ("SLD"). (Stip. ¶5)

6.      PCSB continued to provide M.M. with both Gifted and SLD services upon his enrollment in Kennedy. (Stip. ¶6)

7.      P.M. insisted that M.M. be provided equivalent placement in Pinellas county of both Gifted and SLD services along with needed appropriate accommodations, in January, 1997, M.M. was placed in MEGGS because no other gifted program existed that was age and skill appropriate based on required placement. MEGGS is an advanced mathematics course to prepare students, highly gifted in mathematics, for rapid progression in higher math. M.M. was prepared for the rigors of the class based on his test scores, but was not able to successfully enter the course in the middle of the year because M.M was provided different and inadequate accommodations than his other classes at the objection of P.M. This caused M.M. to experience failure, anxiety and emotional outbursts related to his participation in that class. He was subsequently transferred to an honors algebra class because the other students in the class objected to his presence to the point of significantly impeding the class. (Harshbarger 24; Higgins-Miller p. 424-26; Helphrey p. 367)

### Education and Interventions

8.      Throughout M.M.'s attendance at Kennedy, PCSB made numerous course modifications for M.M., as determined to be appropriate by M.M's IEP teams. Modifications were

4

made in the areas of physical arrangement of the room, lesson presentation, assignments, test taking, organization and behaviors.  M.M. had a set of books at home and one in each class so he did not have to remember his books, he had school supplies provided in each class.  He was allowed to take extra time to complete class work and homework.  He was allowed to turn in assignments done on the computer.  M.M. was also given testing modifications such as additional time and the ability to take tests in a setting outside of the classroom.  These accommodations were not consistently provided where appropriate and created a confusing and impossible learning environment that did not have the required routine necessary for M.M. to function in school as described by experts on page 2 and 3, of Blinded by Their Strengths exhibit 3. (Johnson p. 385; Helphrey p. 374-75; Cappo p. 410-414, 416; Stip ¶6; Ex. 1 pp. 194-279; *see also* Respondent's Ex.3 which is a summary of interventions provided to M.M.)

9.      During the Spring of 1997, teachers at Kennedy prepared daily assignment reports. The reports were collected from each teacher by a staff person and delivered to the after-school program that M.M. attended to ensure that M.M. took them home daily.  This modification was intended to facilitate M.M. in completing and submitting his homework on a timely basis.  This modification while required was not implemented correctly and was not successful and was contrary to the requests of P.M. and written recommendations of experts because it required organizational skills on M.M.'s part that he does not posses due to his handicap.  This was recognized at the end of that school year and his grades were changed in compensation for the inadequate accommodations that were provided. (Robinson p. 457; Carlson p.392)

10.     In the November of 1997, the new principal at Kennedy, Mr. Bessette, determined that the system of daily assignment sheets that had been abandoned at the beginning of the school

year was not achieving the desired effect of assisting M.M. to turn his homework in when due. Mr. Bessette switched to a weekly assignment sheet which he personally ensured was mailed to P.M. every Friday afternoon. The daily assignment sheets were discontinued without notice to P.M. at the beginning of 7th grade. This significant accommodation was abandoned without P.M.'s knowledge or input and nothing was done to replace it until November, 1997 after repeated letters and demands by P.M. to hold an IEP meeting (see p. 401 respondents evidence notebook), that was promised at the beginning of the school in August 1997 (see p. 406 respondents evidence notebook), to provide adequate accommodations was never provided in violation of 34 CFR sec. 300. This delay caused M.M. to become lost and frustrated in his classes and created an environment in which he could not be educated at Kennedy due to him spending on many days 2 to 3 hours per day away from his classes, involuntarily due to referrals related to his disability or voluntarily, crying or upset in the office, because he wanted to participate and learn in class but was being prevented given the accommodations and environment that existed. (Robinson p. 433-448, 457; Bessette p. 486-87; Carlson p. 390, 392)

11. Mr. Bessette refused to provide certain accommodations requested by P.M. on the ground that they were not educationally warranted. First, P.M. requested that M.M. be assigned one half the work assigned to other children and then only be expected to complete one half of that work only as an extreme base line criteria in classes that he was doing poorly and had been damaged by the denial of appropriate accommodations and as a method to increase his self esteem as described in teaching tips by experts (on page 2 and 3, of Blinded by Their Strengths exhibit 3) to bring him up to his completion and full grading of all homework and assignments-- as long as M.M. achieved a grade point average of 3.2 or 3.25   based on admission of the school of providing inappropriate

6

accommodations and resulting grade changes as compensation as had been provided at the end of sixth grade. (Harshbarger p. 58; Ex. 1 p. 427) Mr. Bessette rejected this request because teachers were already instructed to modify the amount of homework M.M. was expected to complete, and given his above average intellect and extra time for completion, the school believed that M.M. should be accountable for all work assigned based on their incorrect assessment of his educational needs disregarding his handicap and the recommendations of experts. Mr. Bessette's decision was supported by the recommendation of The University of South Florida's Center for Autism and Related Disorders ("CARD") which has no experts in M.M.'s disability. (Bessette p. 485; Harshbarger p. 55)

12.     P.M. also requested that M.M. be allowed to turn in his homework a week and a half after the receipt of the assignment at home. This request was rejected however, because the school felt that he needed to have his homework in front of him in class to review and because they were concerned that amount of homework would be overwhelming to him if it were allowed to pile up regardless of the fact the teachers were receiving little or no homework making this logic incorrect and damaging and not considering his disability that he does not learn in the same manner as regular students and can comprehend and learn vast amounts of complex material in a much shorter time than regular students or adults but can not learn under the circumstances that are logical and conducive for learning for regular students without his disability. (Bessette p. 532; Cappo p.407, Harshbarger p.62)

13.     M.M.'s teachers testified that he turned in very little homework, some teachers estimating that he turned in as little as 1% of the required work. They also testified that he did very little work while in class. (Helphrey p. 371; Cappo p. 407; Johnson p. 380.; Higgins-Miller p. 422)

14.    M.M. reported to both Mr. Bessette and Ms. Carlson that he had no homework routine and that he frequently just did not do his homework. This was due to frustration and confusion brought on by the inconsistent application and flagrant disregard of M.M.'s accommodation plan by teachers (Carlson p. 405; Cappo p. 410-414, Bessette p. 481)

15.    P.M. testified that M.M. did all homework that P.M. was aware of. P.M. contends that M.M.'s disability precluded him from being able to return the work to school thus necessitating an added accommodation equal or equivalent to item 12 above to resolve the homework problem. (P.M. p. 557)

16.    P.M. further requested that M.M. be given pretests on the material in the format and covering the same material that would be on the in class test since M.M.'s disability and the damaging environment created prevented him from following the review of homework and review for tests in class. Mr. Bessette agreed to have the teachers provide the test format and sample questions similar to those that would be on the test, but refused to provide the actual test as it would violate the integrity of the tests and serve no educational purpose. This desperately needed accommodation was not consistently provided thus disrupting the routine needed for M.M. to function. (Bessette p. 487-88, Cappo p. 410-414, Petitioner's weekly assignment sheet exhibits).

17.    P.M. requested that Kennedy provide M.M. with a "peer buddy" (or inclusion program) as identified in many states including Florida as a necessary requirement to meet mandated federal requirements of main streaming handicapped children as has been discussed with Vicki Barnette, but the school refused based on the fact that it would be to much work to provide the appropriate accommodations mandated to mainstream handicapped children. There is no formalized peer buddy system in Pinellas County. (Harshbarger p. 64) Further, although the staff

8

at Kennedy attempted to provide M.M. with peer buddies, they had a difficult time finding students willing to put up with M.M.'s verbal abuse since a peer buddy system will not work unless an appropriate program is put in place. (Bessette p. 489-490, Robinson p. 440; Johnson p. 384)

18.     P.M. requested an adult assistant accompany M.M. during the school day. PCSB allocated an additional position for an adult assistant to the school to serve as support to school staff. Mr. Bessette interviewed several candidates but was unable to find anyone to accept the position. (Harshbarger p.71)

19.     Despite M.M.'s intelligence and the numerous accommodations provided to him, his final grades for the 1997-98 school year were Ds and Fs.

### Emotional and Behavior Problems in School

20.     While attending Kennedy, M.M. displayed signs of emotional disturbance. He was frequently anxious and upset. He lost control of himself in the classroom, frequently in relationship to receiving grades that he disagreed with. He threatened to sue teachers and demanded that they be fired for not giving him a good grade. (Robinson p. 440-41; Carlson p. 402; Higgens-Miller p. 426, 431; Helphrey pp. 374-75)     (a)     M.M. also displayed aberrant behaviors while at Kennedy. On occasion, M.M. would stop up sinks and water fountains and leave the water on so they would over flow. M.M. instigated other children by calling them his slave or "chocolate." Twice M.M. smeared his feces on the bathroom walls, other times he urinated on the toilet and left his underwear in the bathroom. Another time M.M. licked his fingers and ran them through a tray of cakes in the cafeteria. These are all traits of stress and anxiety directly related to inappropriate accommodation being provided and the damaging environment that results. (Exhibit 3 page 2 "Do not take misbehavior personally. The high-functioning person with autism is not a manipulative,

9

scheming person who is trying to make life difficult. They are seldom, if ever, capable of being manipulative. Usually misbehavior is the result of efforts to survive experiences which may be confusing, disorienting or frightening. People with autism are, by virtue of their disability, egocentric (Even though they know right from wrong, their thought process (daydreaming) prevents them from considering right from wrong and they do the first thing that pops into their head which creates (even though infrequent) a very dangerous situation for themselves and others if not directly supervised as can be seen in the beatings he has received (Zweifel p. 463)). Most have extreme difficulty reading the reactions of others." "People with autism have problems with abstract and conceptual thinking. Some may eventually acquire abstract skills, but others never will. When abstract concepts must be used, use visual cues, such as drawings or written words, to augment the abstract idea. Avoid asking vague questions such as, "Why did you do that?" Instead, say, "I did not like it when you slammed your book down when I said it was time for gym. Next time put the book down gently and tell me you are angry. Were you showing me that you did not want to go to gym, or that you did not want to stop reading?" Avoid asking essay-type questions. Be as concrete as possible in all your interactions with these students." It is unreasonable to assume that a teacher can read this passage and be able to provide the needed interaction to prevent M.M. from becoming anxious and frightened given the demands placed on the teacher in a class room environment. That is why a teaching assistant or equal accommodation always needs to be available who is trained and aware of these requirements to provide the needed routine and continuity without which M.M.'s can not function. In a different environment such as homebound or as can be provided in school with appropriate accommodations, appropriately and consistently implemented, more adult supervision and a peer program these artificially created signs of emotional disturbance as a result of anxiety

due to his handicap and environment created by incorrect and inconsistent accommodations could be eliminated. In order for M.M. to be emotionally handicapped the conclusion must be drawn that his actions are not due to fear and anxiety related to his communication and processing disabilities which is difficult to logically except given his intellect but never the less clinically accurate and the basis for experts to state that an emotionally handicapped setting is "the worst mismatch possible" (exhibit 3 p. 16). (Robinson pp. 454-56; Johnson p. 384, Morse p. 344-351)

21. On numerous occasions during the 1997-1998 school year, M.M. received disciplinary referrals for inappropriate behavior related to his handicap. (Stip. ¶8) When M.M. misbehaved, he was sent to spend time with Ms. Robinson, the assistant principal. Ms. Robinson would frequently just talk to M.M. about the problems, when punishment was necessary she attempted to select consequences to fit the offense. At all times she accounted for his disability. Ms. Robinson expressed genuine affection and concern for M.M. and attempted to help him deal with his problems brought on by anxiety of the damaging environment created by the school. (Robinson p. 437-450)

22. Kennedy personnel called on resources from numerous sources in their efforts to deal with M.M. and his disabilities. CARD provided training to Kennedy staff and made specific recommendations for working with M.M. PCSB's "Low Prevalence" program provided a resource teacher with experience teaching autistic children and an itinerant teacher for emotionally handicapped students to observe M.M. in class and make recommendations regarding his behavior. Employees of the Florida Diagnostic Learning and Resource System came to Kennedy to present a peer education program to children in M.M.'s MEGGS class. (Robinson p. 456; Bessette p. 486; Harshbarger pp. 54-57)

23.     During the 1997-98 school year, Ms. Carlson, M.M.'s guidance counselor, spent a great deal of time trying to help M.M. gain control of his anxiety.  M.M. was permitted to leave class and go to her office, whenever he felt he was going to lose self control.  He spent numerous hours with Ms. Carlson every week.  Ms. Carlson expressed genuine affection and concern for M.M. and attempted to help him deal with his anxiety problems.  (Carlson pp. 387-88)

24.     Mr. Bessette made a particular point of giving M.M. an hour a week of personal attention.  Bessette has lengthy experience in working with emotionally disturbed and emotionally handicapped children which is inappropriate for M.M.'s disability and felt that M.M. just needed an adult with whom he could hang out.  Mr. Bessette expressed genuine affection and concern for M.M. and attempted to help him deal with his anxiety.  (Bessette pp. 473-475)

25.     One of the main causes of M.M.'s frequent office referrals, and decision to self report to his guidance counselor, was his distress and concern over grades.  M.M. would rip up tests, eat tests, demand a retake, demand immediate explanations or grade adjustments and threaten to have teachers fired if he were not "accommodated."  M.M. reported to Mr. Bessette that grades were stressed at home, at times M.M. went into a litany in which he explained that failure to achieve good grades would cause him to be unable to live in the lifestyle to which he had become accustomed. It is clear that M.M.'s main goal and concern was to succeed in school in a placement that is age and skill appropriate and he is entitled to as part of a free appropriate education based on testing and other criteria used for his placement and that he has the intellect to do so but has been prevented by accommodations being provided without regard to the requirements of his disability by school personnel making logically appropriate educational decision to the best of their knowledge when in fact M.M.'s learning process due to his disability is not logical compared to regular students and

their knowledge and experience.   Reading and understanding Petitioner's exhibit 3 is essential to anyone attempting to teach or make decisions concerning M.M.  This has proven to be an impossible task for school personnel based on their past experience and education and the "Topsy-Turvy World" that M.M.'s disability presents to them.  All school personnel questioned as witnesses identified they are not published experts and all have little or no experience or contact with individuals with M.M.'s disability and all have been unable to provide a single published article by an expert in M.M's disability justifying their actions and decisions in teaching him.  Passages of critical importance are on page 1 of Petitioner's exhibit 3 "unmindful of their neurologically-based weaknesses, teachers and/or clinicians get blinded by the strengths of these children. This situation inevitably leads to a mental set that can be summed up as follows: "If he/she is that smart, shouldn't he/she know better?" (as logically and reasonably concluded by Mr. Bessette  in 11 above) The answer to that question is a resounding "no".  In fact, because of the social-emotional and communication deficits, as well as the presence of symptomatology unique to Asperger's syndrome, these children can't "know better" until they are taught simply to know (i.e., to understand)." (Bessette p. 478-79)

26.  M.M. was involved in 2 documented physical altercations while he was enrolled at Kennedy Middle School.  On October 1, 1997, during an after-school program sponsored by the YMCA, M.M. and another student were involved in a physical altercation on a bus.  During this altercation, M.M. was hit on the top of his head.  On March 18, 1998, M.M. was involved in a fight with another student. (Stip. ¶9) M.M. reported one other incident to Ms. Carlson in which M.M. claimed that he was pushed around in the locker room.  According to Ms. Carlson, M.M. was humiliated but not physically injured.

27.     Other than the incidents described above, M.M. never reported actual physical injuries to any of the caring adults with whom he had frequent contact. (Bessette p. 483-84; Carlson p. 402; Robinson p.458-59) M.M. did not report beatings as one of his concerns to Dr. Fine. Nor did M.M. report severe beatings to Dr. Russell, to whom P.M. took M.M. for counseling related to the alleged beatings. M.M. regularly refused to talk about his beatings he received because he was embarrassed and would regularly relate to P.M. detailed descriptions of past beatings that clearly were not fabricated by M.M.'s mannerisms but M.M. would never disclose specific dates or names since he does not have the social awareness to be concerned with knowing the children he has contact with names.(Fine p. 292)

28.     M.M. has a great deal of difficulty reading social situations. He is inclined to think that other children are picking on him when in fact they are engaging in ordinary behavior. Mr. Bessette testified about an incident where he observed another child accidently bump into M.M.'s notebook causing him to drop it. M.M. left his notebook on the ground and ran over to Bessette complaining that the other child was "beating on him." (Bessette p. 483)

29.     Individuals with Aspergers and high functioning autism have difficulty interpreting social situations. They frequently experience difficulty with anxiety and depression. Individuals with autistic spectrum disorders have a tendency to misinterpret social cues. They also have difficulty reading facial expressions, difficulty with interpreting the intimation in someone's voice, an inability to understand the underlying message in a spoken assumption, and an inability to interpret sarcasm. (Fine p. 184-87; Wheeler p. 269-70, 293)

## Events Leading to Request for Due Process Hearing

30.     In the spring of 1997, PCSB personnel began to question M.M.'s eligibility for SLD services as it appeared that M.M. had emotional and behavioral problems rather than a specific learning disability.  On April 11, 1997, P.M. was asked to give permission for PCSB to reevaluate M.M. (Harshbarger p. 73- ; Ex. 1 P. 152)

31.     Evaluations began that summer and continued into the fall of 1997.  On December 17, 1997, a school staffing team met to discuss M.M.'s eligibility for Exceptional Student Education Services.  The team agreed that M.M. did not meet the criteria for SLD program, but that he did meet the criteria for emotionally handicapped.  (Ex. 1 p. 57-59).  At that point, the School District determined that it would be advisable to obtain an additional evaluation by a pediatric neuropsychologist.  Dr. Fine's evaluation was completed in March.  (Harshbarger p. 81-82)

32.     The School District attempted to convene an eligibility IEP meeting in April of 1998, but the meeting was postponed at P.M.'s request to June 4, 1998.  Prior to the meeting, P.M. was informed that the School District proposed to dismiss M.M. from eligibility for SLD, continue him in Gifted, and find him eligible for EH and Other Health Impaired ("OHI").  (Ex. 1 p. 46; Harshbarger p. 84)

33.     P.M. attended the June 4, 1998 eligibility IEP meeting.  The School District presented its data and expressed its view that M.M. met the eligibility criteria for EH, but did not meet the criteria for SLD.  P.M. objected to the determination that M.M. was emotionally handicapped.  Despite his objection, an IEP was created at that time.  (Harshbarger p. 82-86; Ex. 1 p. 27-34)

15

34.   P.M. brought a doctor's medical statement to the June 4, 1998 meeting stating that M.M. was unable to attend school and required hospital homebound education.   Thus, M.M.'s physical placement was changed to hospital/homebound.

35.   On August 26, 1998, P.M. requested a due process hearing challenging the eligibility determinations made at the June 4, 1998 IEP conference.

### Eligibility for Specific Programs

36.   All experts testified that M.M. meets the eligibility criteria for Emotionally Handicapped (EH) program pursuant to the School District's Special Programs and Procedures for Exceptional Students.   Specifically, M.M.'s heightened levels of anxiety and depression interfere with his functioning in the academic process.   All experts also agreed that an emotionally handicapped class room is not the place for M.M.   An Other Health Impairment (OHI) placement would allow M.M. to receive needed services without the risk of school personnel inadvertently misusing the EH placement to the detriment of M.M. as they have consistently done in the past in administering needed accommodations.   (Foradada p. 613-614) .  (Fine p. 181; Wheeler p. 285; Foradada p. 608; Russell Deposition p. 17)

37.   The School District's experts testified that M.M. does not meet the eligibility criteria for Specific Learning Disabilities (SLD) pursuant to the School District's Special Programs and Procedures for Exceptional Students.   Specifically, M.M. does not possess a processing deficit as required by the eligibility criteria. (Fine p. 181;  Wheeler p. 279)  Neither of P.M.'s experts testified that M.M. meets the eligibility criteria for Specific Learning Disabilities.   Yet by definition of his disability all experts agree that he can not correctly process communication and social cues and as Dr. Foradada stated "we have to understand the way Michael processes information is totally

different from ours"(Foradada p. 600). Due to his strengths related to his handicap that over shadow his very significant processing deficits the (SLD) criteria precludes him from that program that he would otherwise be entitled to if it were not for his handicap which is direct violation of the 504 mandate to allow handicapped individuals access to programs.

38.     The School District's expert testified that M.M. does not meet the eligibility criteria for Autism pursuant to the School District's Special Programs and Procedures for Exceptional Students. (Dr. Wheeler p. 276) Neither of P.M.'s experts testified that M.M. meets the eligibility criteria for Autism. However by definition and testimony of all experts M.M. has an autistic related disorder and the eligibility criteria is a direct violation of 504 mandates as described in item 37.

### Professional Evaluations of M.M.'s Needs

39.     Dr. Fine testified that M.M. exhibits considerable levels of anxiety and depression. His anxiety is both free floating, and specific. Some of his specific anxiety concerns his desire to earn the highest grade possible. M.M. is very much influenced by his father's, peers and school personnel's messages to him as far as the need to succeed at certain levels academically. M.M. perceives the consequences of failure as dire, and his self esteem is therefore diminished when he fails to meet his own academic expectations. (Fine p. 176-77, 179-80) Neither of P.M.'s experts disagreed with Dr. Fine's written methodology or the report of her evaluation. (Russell depo. p. 20-21; Foradada p. 602-604)

40.     M.M.'s self esteem is largely related to his grades, most of the experts and teachers questioned on the matter of grades believe that changing M.M.'s grades to insure that he receives As and Bs will benefit his self esteem. ( Foradada p. 600, 613, Morse p. 347, Petitioner's Exhibit 3)

41.    The experts agree that M.M.'s talents in mathematics and science should be encouraged and stimulated. They further agree, however, that to the extent that M.M. cannot be successful in gifted classes for every subject, his attendance in such classes would exacerbate his self esteem problems without appropriate accommodations. (Fine p. 180; Foradada p. 612-13)

42.    School District employees testified that M.M. displays an elevated level of performance anxiety, he is obsessed with his grades. M.M. reported to Dr. Fine that he had to get good grades in order to get into an ivy league school, otherwise he would have to live like "sub-human mongoloids" even though no one questioned has suggested to M.M. that he should go to an Ivy League school and P.M. has always told him he should aspire to a community college given his situation. (Carlson p.389, 403-04; Fine p. 178; Morse p. 345, 347)

43.    P.M. asserts that M.M.'s anxiety was produced by inappropriately, inconsistently and refusal by teachers to provide appropriate or even documented accommodations by the IEP team and the "beatings" and "mental and self esteem damages" suffered while at Kennedy. (Ex. 1 p. 324) However, an evaluation performed by Dr. Wheeler after M.M. was in hospital homebound showed that the removal from classroom setting to homebound has reduced M.M.'s stress somewhat, but he still exhibits high levels of stress, anxiety and depression in the hospital homebound setting strictly relating to interaction with school personnel like Dr. Wheeler who M.M. is still afraid of and believes they are continuing to plan how to hurt him. (Wheeler p. 269)

44.    Both of P.M.'s experts testified that M.M.'s academic, emotional, and behavior problems are mainly attributable to his disability. The School District's expert, Dr. Wheeler, testified that his recent survey of the current research shows most children with Asperger's are academically successful in school despite having some social/interpersonal problems as can be seen

18

in M.M.'s current academic and emotional success in homebound placement (Morse p 347). Dr. Wheeler therefore opined that M.M.'s social and emotional difficulties were not entirely based on Asperger's Syndrome. This leads to the conclusion that the educational setting provided at Kennedy was damaging and inappropriate since M.M. has demonstrated he can learn at a gifted level in homebound. (Wheeler p. 272-73)

45.      All experts concur that M.M. needs specific instruction on social skills. Dr. Fine recommended that M.M. be served in EH for one particular class, unique skills, in which the class works on social skills, organization, study skills and life skills.  Then the supports, including behavior plan from that class could be carried through the day. (Fine p. 182)  Dr. Wheeler acknowledged that there were both EH and Autistic classes which might be available to serve M.M.'s need for social and interpersonal skills. (Wheeler, p. 307, 309) Drs. Foradada and Russell concurred that social skills training was both necessary and important for M.M. (Foradada p. 606; Russell Depo. p. 44) but Dr. Russell clearly stated he did not evaluate M.M. for placement and could not make a recommendation except in a general sense that may not apply to M.M. and Dr. Foradada agreed with experts in Petitioner's exhibit 3 that EH would be a least appropriate placement unless their was no other choice for qualifying to receive services, therefore EH placement is not needed since M.M. is already placed in OHI. (Foradada p. 598)

46.      Although the experts recognized that peer buddies could be helpful under limited circumstances, no expert testified that a peer buddy program could resolve all M.M.'s social deficits. To the contrary, they expressed concerns about the ability of other children to guide M.M. in social settings without a proven program.  This detrimental effect is what occurred at Kennedy when a peer buddy was tried without a proven program as available through Vicki Barnette or other program

identified in Petitioner's exhibit on peer programs, the same as what occurred with appropriate accommodations inconsistently and inappropriately applied. Dr. Wheeler explained that it is not within the normal capabilities of a 13 year old to understand how to deal with all the unique issues and unique personality that M.M. presents. (Wheeler p. 295) Dr. Foradada, Petitioner's expert, expressed doubt that a peer could be found to perform the role that P.M. described unless a proven program was implemented. (Foradada p. 599)

47.     The experts also agree that it would be detrimental to M.M. to place him in a classroom with children who have conduct disorders. (Fine p. 182; Foradada p. 598; Wheeler p. 302-03)

48.     P.M. has never asserted that he and Dr. Foradada alone should  make educational decisions independent of the school system as stated by Ms. Rosenberg. P.M. has requested that in placement and reasonable accommodation issues where the school system has no expert that can point to published data concerning their recommendations for M.M.'s disability and Dr. Foradada finds their proposals medically inappropriate Dr. Forradada and P.M. should be given final say in only those specific areas to avoid further damage to M.M.  Dr. Foradada, the expert with whom P.M. wants to consult agrees that certain placement and accommodations currently proposed for M.M by the school system are inappropriate and incorrect and are analogous to "let's say we were going to isolate patients with headaches, okay, for treatment, and let's say we chose to treat all the patients with headaches with an aspirin.  All those that have simple headaches will get well, but those who have a brain tumor are not going to do well". (Foradada p. 605, 609)

49.     Dr. Foradada also testified that M.M.'s obsessive compulsive behaviors and attention deficits may be better addressed with medication in the future if proper placement and

accommodations are provided and further help from medication is needed because there is no basis for over medicating M.M. when it is not needed because it is essential he be allowed to have obsessive behavior to a certain degree in gifted areas. The key to his success is capitalizing on allowing him to have obsessive behavior in his gifted classes which he will be able to do if he thinks he does well in those areas. As described above M.M's mind set is good grades which is virtually impossible to change given there is no way to deceive him to believe he will be able to advance in his education or be successful in peers and teachers eyes unless he has good grades. (Foradada p. 611-13)

50.     State law controls the availability of the G.E.D. and dual enrollment, but the Respondent has agreed not to oppose Petitioner's efforts to obtain either remedy. With regard to the specific services and accommodations requested by Petitioner, Respondent agrees to consider them in a future I.E.P. meeting, but asserts that it is not the function of the Administrative Law Judge to require a specific placement. (Stip. ¶10)

51.     Both of P.M.'s experts testified and all parties agree that allowing M.M. to take the G.E.D. or dual enroll in community college are not appropriate options unless he can not receive a free appropriate education any way else at this time. Dr. Russell concurred with the opinions of Ms. Harshbarger and Dr. Wheeler that while M.M. may be able to handle the material on cognitive level, he could not handle the situation from a social/emotional standpoint and even though none of these individuals are qualified to make that decision since Dr. Russell has specifically stated he has not evaluated M.M. for placement. Both of P.M.'s experts and P.M. agree, however, that M.M. may be able to handle the material on cognitive level, but, he could not handle physically attending college classes from a social/emotional standpoint. Also, they agree that taking the G.E.D. to

obtain access to a community college program or dual enrollment in a community college would be a great benefit to M.M. given the circumstance that he only take television and Internet courses since television and Internet courses are not available through the school system and only the community college, if he can not receive a free public education any other way and not be allowed to safely participate with age level peer programs due to the inflexibility of the programs and services offered by the school system, since it has been established he can handle the material on a cognitive level, it is essential he be allowed to have obsessive behavior to a certain degree in gifted areas and there is no other way for him to advance cognitively and in taking these course he would not be hindered by his limitations of not being able to handle physically attending college classes from a social/emotional standpoint. Also, after successfully taking community college classes in this manner, developing self esteem and ability to learn at college level , given the benefits college courses offer to him of independent learning in the form of complete course outlines and syllabus which include homework and reading assignments for the whole course and testing dates and what the tests will cover and homework due dates at the beginning of the course which are the accommodations he needs from the school system and can not receive but are standard practice and not accommodations in college, given as Dr. Foradada (Foradada p. 600) and experts say "we have to understand the way Michael processes information and learns, which is totally different from ours" and while an age peer to M.M. can learn and receive information in a day to day assignment environment the school system provides and would have difficulty and be lost in the above described college routine the opposite is true for M.M. due to his disability and the way he learns and his unique skills and experts say that middle school is the worst time for M.M. and when people with this disorder go to college it is like they died and went to heaven because M.M. can

22

successfully interact with adults and college students who will have more understanding and tolerance of his slightly abnormal behavior and thus avoid the rejection and ridicule that explodes into severely aberrant behavior on M.M's part he will very possibly be able to eventually successfully overcome the social/emotional barriers to physically attending college courses. (Russell depo. pp 5, 34-36; Harshbarger pp. 93-95; Wheeler pp. 295-97)

### Resolution of Disputed Issues of Fact[2]

52.      The first issue presented was whether "PCSB has correctly determined M.M. to be eligible for the emotionally handicapped (EH) program." Alternatively, the first issue presented was whether "PCSB placing M.M. in the emotionally handicapped program is at risk of having a negative benefit to him and is inappropriate."   The Division finds and all parties agree that PCSB did correctly determine M.M. to be eligible for special education services under the criteria for emotionally handicapped but due to section 504 of the Rehabilitation Act of 1973 (504) and other reasons described below M.M should not be placed in EH and should stay put in his past gifted and SLD placement or receive equal services through only OHI as described below.  Placement in an emotionally handicapped program is clearly detrimental to M.M., has no benefits and is against the advise of experts due to his unique history of which the label of EH will frighten him and create negative obsessive behavior, damage M.M.'s self esteem, have no placement benefits since O.H.I. placement meets his needs, creates a severe risk of inappropriate services being provided given the physical impossibility and track record of properly educating needed school personnel and overcoming their ingrained professional education and experience in instinctively applying logical but inappropriate and damaging for his disability, interventions as has been done in the past.  All

---

2      Issues identified in the Pre-Hearing Stipulation as requiring determination by the Division.

agree placement in a class with children who have conduct disorders would be inappropriate for M.M. However, the fact that PCSB has not currently proposed such a placement does not protect him from the unqualified school personnel who currently have authority given an EH placement and current school guidelines. The issue is not whether PCSB has correctly placed M.M. in EH per criteria but whether the criteria itself violates section 504 of the Rehabilitation Act of 1973 (504) and precludes and limits M.M.'s entrance and participation in, and denies him the benefits of the label those other programs will provide (given the school environment of unqualified school personnel in M.M.'s disability who currently have authority for day to day services to be provided within current school guidelines ) which M.M. is being denied and discriminated against solely due to his handicap by way of the unique combination of its features where by he would otherwise qualify to receive the full benefit of the programs and the protection from unqualified school personnel those labels he had in the past of only gifted and SLD afford him and what is currently requested by the Petitioner of the right to stay put in those programs given the school system has shown no benefit to M.M. in EH placement (other than qualifying for services which is not true since he can qualify under OHI without the risks and detriment of EH), has no plans for him to receive EH services and agrees those services would be detrimental to him.

53.    The second issue presented was whether "PCSB complied with the modification plan established by M.M.'s IEP team." The Division finds that PCSB did not adequately comply with the modifications recommended by M.M.'s IEP team to provide him a FAPE.

54.    The third issue presented was whether "M.M. was involved in more than 2 physical altercations while enrolled at Kennedy Middle School and many occasions of assault." The Division

24

finds that the evidence suggests that M.M. was actually involved in three physical altercations and due to the definition of assault M.M. truly lived in constant fear of physical abuse due to the accommodations provided, environment created and the unique way he thinks due to his handicap which could have prevented.

55.     The fourth issue presented was whether "M.M. is entitled to access to educational programs without meeting all requirements of those programs if those requirements prevent M.M. from entering the program solely because of his handicap.   And whether entitlement to such programs should be based partially on recommendations from M.M.'s MD doctor with parental approval and placement and reasonable accommodation issues where the school system has no expert that can point to published data concerning their recommendations for M.M.'s disability and Dr. Foradada finds their proposals medically inappropriate, Dr. Foradada and P.M. should be given final say in only those specific areas to avoid further damage to M.M.." Alternatively, the fourth issue was presented as whether "M.M. is entitled to access to educational programs with consideration of his handicap and that appropriate accommodations were not provided in the past. And whether entitlement to such programs should be based on recommendations from M.M.'s MD doctor with parental approval." The Division finds that needed appropriate accommodations were denied to M.M. and he should not be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity solely by reason of his handicap."

56.     The fifth issue presented was whether "an approved peer buddy program exists, and if so, whether such a program, is required to provide M.M. a FAPE." The Division finds that Petitioner presented  evidence that a peer buddy program exists and a peer buddy program or its equivalent should be provided and  is required to provide M.M. a FAPE. "

25

57.     The sixth issue presented was whether "M.M. was assigned homework appropriate for his disability given the circumstances he was placed in." The Division finds that M.M.'s homework assignments were inappropriate for his disabilities because they were inappropriately applied by teachers and inconsistent with his IEP plan accommodations.

58.     The seventh issue presented was whether "M.M. was provided a detailed description of test content and format or pre-test appropriate for his disability and whether such was required to provide him with a FAPE." The Division finds that the requisite test information was not provided to M.M. to provide M.M. a FAPE.

59.     The seventh issue presented was whether an "adult assistant or equivalent to accompany him in school and on the bus are required in order to provide M.M. a FAPE." The Division finds that an adult assistant or equivalent is required to provide M.M. with a FAPE.

## CONCLUSIONS OF LAW

60.     M.M. is a "child with disabilities" entitled to the protections of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 et seq. and Florida Statutes.

61.     M.M. is a disabled individual entitled to the protections of §504 of the Rehabilitation Act of 1973.

62.     The IDEA and Florida law require the School District to provide M.M. with a free appropriate public education ("FAPE"). *Board of Educ. of Hendrick Hudson School Dist. v. Rowley*, 458 U.S. 176 (U.S. 1982).

63.     The law does not require PCSB to maximize M.M.'s educational benefit, nor does it guarantee that he reach a specific level of academic achievement. *Rowley*, 458 U.S. at 197; *JSK v. Hendry County School Bd.*, 941 F.2d 1563, 1572 (11th Cir. 1991)(schools are not required to

maximize a child's potential.) Maximizing M.M.'s educational potential is not at issue in this case because any appropriate education is being requested. This has not been provided based on the amount of time M.M. was out of class and not being able to pass due to services that were not provided.

64.     PCSB has met neither prongs of the *Rowley* Court's test for determining whether a proposed IEP is appropriate. The IEP was not reasonably calculated to enable the child to achieve passing marks and advance from grade to grade and required procedure was not followed in the timing, content and implementation of the IEP.

65.     First, the Division finds that the 1998-99 IEP developed on June 4, 1998 is substantively inappropriate in that needed accommodations that were agreed to be jointly developed in August of 1997 were never done as stated. All requisite persons were not in attendance at the IEP meeting in which changes were made to the accommodation plan. M.M.'s IEP does not meet *Rowley's* requirement that the school provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."

66.     Second, the Division finds that procedural safeguards of §1415 of the IDEA and Florida Administrative Code 6A-6.03311 were denied to P.M. P.M. was denied access and input into critical decisions of implementing M.M.'s IEP and accommodation plan and critical changes and exclusions were made that made the accommodation plan unworkable since it critically depended on parent teacher interaction and was changed without his knowledge or input.

67.     P.M.'s "objections" to the continuances and discovery rulings of the Administrative Law Judge constitute procedural due process violations.

68.    PCSB's determination in June 1998, that M.M. was eligible for services pursuant to the EH program was a violation of the "stay-put" provision of the IDEA.  20 U.S.C. §1415(e)(3)(A). The "stay-put" provision requires a School District to keep a child in the child's prior placement during the pendency of a due process hearing.  Pursuant to Notice of Interpretation 46 Federal Register 5461 (January 19, 1981)  Individualized Educational Plan, Item 35(a), a. "There may be instances where the parents and agency are in agreement about the basic IEP services (e.g., the child's placement and/or the special education services), but disagree about the provision of a particular related service (i.e., whether the service is needed and/or the amount to be provided).  In such cases, it is recommended (1) that the IEP be implemented in all areas in which there is agreement, (2) that the document indicate the points of disagreement, and (3) that procedures be initiated to resolve the disagreement. "

69. Section 504 of the Rehabilitation Act states that "No otherwise qualified individual with a disability in the United States . .  shall by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. §794.

70.    Section 504 is used for school children with disabilities that would not be otherwise qualified as children with disabilities under the IDEA.  Although the criteria for eligibility is lower than the IDEA, it is not an entitlement program.  Because M.M. is eligible for protections of the IDEA, including an extensive individual education plan, PCSB is not legally required to provide him with an accommodation plan pursuant to §504 but are required to provide FAPE and the evidence presented clearly shows M.M. can not receive FAPE without an accommodation plan..

28

71.    Although Administrative Law Judge can determine that an IEP does not provide FAPE, and can recommend educational methodologies, he or she cannot order specific modifications to be implemented. *Board of Education of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176 (1982) and *Lachman v. Illinois State Bd. of Educ.*, 853 F.2d 290 (7th Cir. 1988)

72.    PCSB's proposed education has proven not to meet M.M.'s educational needs and not provide for his safety and not provide the least restrictive environment.   Based on this failure by PCSB to provide M.M. FAPE continuance of M.M. in hospital/homebound is medically required and forces M.M. into the most restrictive educational environment.

## RECOMMENDATIONS

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that the Division enter a final order finding that PCSB has not  provided M.M. with a free appropriate public education, and further finding, that M.M.'s substantive and due process rights have been violated.

_____

Philip Matonte, pro se
320 Island Way, #506
Clearwater, FL 33767